Ralph W. KEITH and Esther May Keith, husband and wife; Harold E. Grady, and Edith W. Grady, husband and wife; James B. Gillispie and Helen M. Gillispie, husband and wife, on behalf of themselves and all others similarly situated; National Association for the Advancement of Colored People, a nonprofit corporation; the Sierra Club, a nonprofit corporation; Environmental Defense Fund, Inc., a nonprofit corporation; Freeway Fighters, an unincorporated association; City of Hawthorne, a municipal corporation, Plaintiffs,

v.

John A. VOLPE, individually and as Secretary of Transportation; Sheridan A. Farin, individually and as Administrator for Region 7, Federal Highway Administration, Department of Transportation; Donald E. Trull, individually and as Division Engineer, Federal Highway Administration, Department of Transportation; California Highway Commission; California Department of Public Works; James A. Moe, individually and as Director of California Department of Public Works; Robert Datel, individually and as State Highway Engineer, California Division of Highways, California Department of Public Works, Defendants.

Earl WRIGHT, Rose Kimball Hillman, Pablo Zapeta, and Minnie Hadley, Additional Plaintiffs on Supplemental Complaint,

v.

CITY OF HAWTHORNE, a municipal corporation; City Council of the City of Hawthorne; Betty J. Ainsworth, Steve Andersen, Chuck Bookhammer, Guy J. Hocker, and David M. York, as members of the City Council of the City of Hawthorne, Defendants on Supplemental Complaint.

California Department of Housing and Community Development; California Department of Transportation, Intervenors on Supplemental Complaint.

Goldrich & Kest, Inc., a California Corporation, Intervenors on Supplemental Complaint.

Civ. No. 72–355–HP.

United States District Court, C.D. California.

Sept. 3, 1985.

Center for Law in the Public Interest, Bill Lann Lee, Elsa Leyva, Los Angeles, Cal., for the plaintiffs.

Department of Transp., Bruce Behrens, Joel G. Philipp, Sacramento, Cal., for the State of California.

Burke, Williams & Sorensen, Richard R. Terzian, Cristina L. Sierra, Los Angeles, Cal., for the City of Hawthorne.

Office of the Atty. Gen., Los Angeles, Cal., for the Dept. of Housing and Community Development.

Richard H. Levin, A Law Corp., Stephen A. Seideman, Los Angeles, Cal., for Goldrich & Kest, Inc., a California Corp.

TABLE OF CONTENTS

FACTS ..................................... 1136
JURISDICTION ............................. 1145
ANALYSIS ................................. 1147
 Title VIII ................................ 1147
 Plaintiffs' Prima Facie Case ............. 1148
 Supplemental Defendants' Justifications ... 1152
 California Government Code § 65008 ........ 1157
 Discrimination on the Basis of Race ...... 1157
 Discrimination on the Basis of Income .... 1158
 Discrimination on the Basis of Government
 Assistance .............................. 1159
CONCLUSION .............................. 1160
APPENDIX A .............................. 1160

MEMORANDUM AND ORDER ENJOINING HAWTHORNE FROM VIOLATING TITLE VIII, 42 U.S.C. § 3604(a), AND CALIFORNIA GOV.CODE § 65008(b), (c) & (d).

FACTS

PREGERSON, Circuit Judge.

In February of 1972, persons living in the path of the proposed I–105 or Century Freeway, the Los Angeles chapter of the National Association for the Advancement of Colored People (NAACP), and others[1] filed this environmental and civil rights lawsuit against state and federal governmental officials.[2] In April of 1972, the

---

1. The plaintiffs also included the Sierra Club, the Environmental Defense Fund, and the Freeway Fighters. *See* First Amended Complaint at pp. 10–11.

2. The defendants included the Secretary of the United States Department of Transportation, the Administrator for Region 7 of the Federal Highway Administration, the Division Engineer for the Department of Transportation, the California Highway Commission, the California De-

plaintiffs amended the complaint to add the city of Hawthorne, located in the path of the freeway, as an additional plaintiff. The First Amended Complaint requested injunctive and declaratory relief that would require governmental officials to comply with federal and state laws designed to (1) protect the environment; (2) assure the availability of decent, safe, and sanitary replacement housing to displaced homeowners and tenants; and (3) eliminate discrimination against minority and poor persons seeking replacement housing.

In July of 1972, this court preliminarily enjoined further work on the freeway project until federal and state officials complied with environmental protection and relocation assistance statutes. *Keith v. Volpe*, 352 F.Supp. 1324 (C.D.Cal.1972), *aff'd en banc sub nom. Keith v. California Highway Commission*, 506 F.2d 696 (9th Cir.1974), *cert. denied*, 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975).

After this court's decision, the parties entered into negotiations that culminated in the Amended Final Consent Decree (the Consent Decree). On September 22, 1981, this court approved the Consent Decree, dissolved the preliminary injunction, and permitted further work on the freeway project pursuant to the decree's provisions. Under paragraphs VI and VIII of the decree, this court retained jurisdiction to enforce or amend the decree until the court enters a Judgment of Dismissal after full compliance with all terms of the decree. Amended Final Consent Decree at pp. 15–16.

One of the purposes of the decree is "to provide for the housing needs of those living in the area of the proposed path of the freeway." [3] Amended Final Consent Decree at p. 3. In particular, the decree requires that state and federal defendants provide freeway displacees with 3700 units of decent, safe, and sanitary replenishment housing either by rehabilitating existing structures or constructing new units. *Id.*, Exhibit B at pp. 1–4. Replenishment housing is to be provided in accordance with the decree's "Housing Plan." Amended Final Consent Decree at pp. 4, 15. The decree incorporates an Exhibit B entitled "Development and Implementation of Housing Plan," detailing the state and federal defendants' commitments to "the provision of housing as part of the I–105 project in order to replenish the housing stock of communities affected by the freeway and to relocate persons now residing within the right-of-way." *Id.*, Exhibit B at p. 1. The California Department of Housing and Community Development (HCD) is the lead agency responsible for coordinating and implementing the Housing Plan. *Id.*, Exhibit B at p. 9. The decree also establishes a Housing Advisory Committee, which includes representatives of each of the cities affected by the freeway, to assist HCD in preparing the Housing Plan. *Id.*, Exhibit B at pp. 11–14.

Exhibit B sets out certain basic parameters HCD must follow in preparing the Housing Plan. Amended Final Consent Decree, Exhibit B at p. 16. Under the Housing Plan, 55% of all replenishment units must be affordable to low income households and 25% must be affordable to moderate income households.[4] Low and moderate income households displaced by

partment of Public Works, the Director of the California Department of Public Works, and the State Highway Engineer and Chief of the Division of Highways. *See* First Amended Complaint at pp. 11–13.

3. The decree also provides for an affirmative action program to ensure that qualified women and minority contractors and employees get a fair share of the construction contracts and the 20,000 jobs the project is creating.

4. Exhibit B states that at least 5% of all units must be affordable to very very low income households, defined as households whose in-

comes do not exceed 25% of the median income for the Los Angeles Standard Metropolitan Statistical Area (LA SMSA) as adjusted for household size; 25% of the units must be affordable to very low income households, defined as households whose incomes are greater than 25%, but not more than 50%, of the median income for the LA SMSA as adjusted for household size; 25% of the units must be affordable to low income households, defined as households whose incomes are greater than 50%, but not more than 80%, of the median income for LA SMSA as adjusted for household size; and 25% of the units must be affordable for moder-

the Freeway must be given first priority to occupy the replenishment rental units.[5] Finally, the Housing Plan must place as many of the units as possible in the "primary zone"—i.e., a zone six miles on each side of the proposed Century Freeway right-of-way.[6]

The freeway, when completed, will run through the northern edge of Hawthorne, affecting census tracts 6017, 6020.02, 6021.01, and 6027. Although the freeway will reduce Hawthorne's housing stock by approximately 1,104 household units, the Housing Plan allocates only 275 units of replenishment housing to be built in Hawthorne.[7] Moreover, to date, there are only two Century Freeway-related housing projects pending construction in Hawthorne: a 44 unit condominium development and a 26 unit apartment development, neither of which required any zone changes, lot divisions, or special use permits from the city. Exhibit 202 at pp. 3–4. There is also a 42 unit condominium development on property that the city is presently in the process of annexing and 16 single family dwellings outside the city limits, but within Hawthorne's sphere of influence. *Id.* Even including the developments outside of Hawthorne's city limits, there are only 128 units of housing pending development out of a total of 275 units allocated.

The litigation presently before this court concerns two Century Freeway apartment developments proposed to be constructed in the Moneta Gardens area of Hawthorne.

The first, the "Cerise Development," located at 14330 Cerise Avenue, consists of 32 apartment units. On January 26, 1984, the developer, Shapell Housing, Inc., filed applications with Hawthorne's Planning Department for a change of zone from M–1 (limited industrial) to R–3 (high density residential) and for a site development permit. The Century Freeway Housing Program had approved the project and the State had agreed to fund it pursuant to the decree.[8] Exhibit 6 at p. 2.

The Planning Department recommended approval of the applications, stating that:

Staff analysis of the unit design and project density finds it to be a good example of a high density development that adequately mitigates the overpowering mass of typical high density residential developments. Also, the spacial arrangement of the units, in staff's opinion, creates a living environment which is protective and complimentary with other residential development in the area.

Exhibit 6 at p. 2.

However, "[n]otwithstanding" the project's advantages, the staff noted that

ate income households, defined as households whose incomes are greater than 80%, but not more than 120%, of the median income for the LA SMSA as adjusted for household size. Amended Final Consent Decree, Exhibit B at pp. 20–21.

5. Second priority goes to households on housing authority waiting lists whose incomes fall within the target populations. Third priority goes to all other households whose incomes fall within the target populations. Amended Final Consent Decree, Exhibit B at pp. 23–24.

6. Exhibit B states that there shall be three distinct zones for placement of the replenishment units:

The primary zone approximates an area within six miles on each side of the I–105 right-of-way; the secondary zone extends an additional six miles; and the tertiary zone yet another six miles. The Housing Plan ... will attempt to place as many replacement units as possible in the primary zone; if suitable sites are unavailable, the remainder should be placed

in the secondary zone; if suitable sites still remain, the units may be proposed for siting in the tertiary zone. If there are still insufficient sites available in all three zones, the Project Director may provide for relocation beyond the identified zones but in each instance must attempt to locate the structures as close to the Corridor area as possible and reasonable.

Amended Final Consent Decree, Exhibit B at p. 11.

The City of Hawthorne is within the primary zone and thus first choice for the placement of replenishment housing.

7. Hawthorne's representative on the Housing Advisory Committee participated in setting this figure.

8. The two rental housing projects at issue, the Cerise and the Kornblum Developments, are both "turnkey projects." HCD selects the developers' projects, funds the construction, and then sells the projects to private parties after the projects' completion. *See* Exhibit 6 at p. 3.

"the project is unique to the city as it is funded by a State agency." *Id.* The staff concluded that the Consent Decree's requirement that 55% of the units be rented to low income tenants conflicted with the city's policy "to support the dispersion of low income housing" because "the project clearly presents itself as a concentration of low or moderate income households." *Id.* at p. 3. Therefore, the staff recommended approval of the developer's applications on condition that the developer record a covenant providing that only 20% of the units could be rented to low income households. *Id.* at 5. The Planning Department staff subsequently revised its recommendation for approval, increasing the percentage of low-income units to 35%. Exhibit 7 at p. 4.

On September 5, 1984, the Planning Commission approved the Cerise Development change of zone and site development applications subject to the 35% covenant the Planning Department had recommended. Exhibit 208.

Shapell appealed the decision of the Planning Commission to the Hawthorne City Council. Before the public hearing on this appeal, the Director of HCD sent a letter to the Mayor of Hawthorne, explaining that because the 35% covenant conflicted with the terms of the Consent Decree, the State would be unable to fund the Cerise Development if the covenant were required.[9] Letter of October 3, 1984, Exhibit 1 at p. 1. Nevertheless, on January 14, 1985, the City Council affirmed the action of the Planning

Commission, including its requirement of the 35% covenant.

The second development, the "Kornblum Development," located at 13000 and 13001 Kornblum Avenue, is a 96 unit apartment complex. The developer, Goldrich & Kest, Inc., filed applications for a lot split, a zoning change from H (horticultural) to R–3 (residential), and site development. The Century Freeway Housing Program had earlier approved the project and the State had agreed to fund it pursuant to the decree.

The Planning Department recommended approval of the applications, stating that the Kornblum Development was "a good example of a medium density development that adequately mitigates the overpowering mass of typical two and three story apartment developments in the area." Exhibit 9 at p. 4. The staff recommended, however, that the developer be required to record a covenant, identical to the covenant required for the Cerise development, providing that no more than 35% of the units be rented to low income families. *Id.* at 7.

The Planning Commission held a public hearing on October 3, 1984. A number of Hawthorne residents appeared and expressed opposition to the development.[10] At the end of the hearing, the Planning Commission voted 3–0, with one abstention, to deny Goldrich & Kest's applications for lot split, zone change, and site development. Exhibit 15 at p. 6.

9. In letter dated November 21, 1984, the Director of HCD altered her position and assured the city that "we will adhere to our prior agreement that the projects will be maintained at the 35 percent low income to 65 percent moderate/middle income throughout the life of the project." Exhibit 8 at p. 2. HCD apparently believed that an outright restrictive convenant was illegal under the California Government Code and precluded State funding, but that an informal agreement to administratively restrict the proportion of low income residents was acceptable. Exhibit 21 at pp. 19–22. Whether or not this position has any legal support, it was not persuasive to the Hawthorne City Council, which insisted on the covenant despite the November 21 letter. Moreover, in HCD's last written statement of its position, a letter to the City Manager dated November 27, 1984, HCD's Chief

Deputy Director reiterated that the 35% violation was "a serious constraint upon the development of housing for lower-income households, and a possible violation of Government Code 65008." Exhibit 4 at p. 4.

10. The Minutes of the Hawthorne Planning Commission stated that one of Hawthorne's residents, Mr. Raymon Sulser, "discussed who would be able to be housed in this project. Past experience has shown that the city was never involved in the selection of who would be located in a similar project. He had read the conditions recommended by staff as outlined in the staff report and asked who would enforce these conditions. He was also concerned with traffic, crime, etc. that this project would bring to the area." Exhibit 15 at p. 4.

Goldrich & Kest appealed the Planning Commission's denial of approval to the City Council. The Council held two public hearings on November 13 and November 26, 1984. Local residents attended the November 13 hearing and expressed opposition to the project. They raised concerns about possible loss of taxes to the city, increase in traffic, overcrowding of schools, and failure to maintain the building, but also expressed opposition to the low income tenants that would reside in the building.[11]

The developer addressed each of the legitimate concerns raised. He explained that the tax loss to the city, if any, would be minimal and offered to enter a ten year in lieu of property tax agreement to make up the difference in taxes between what the city would receive from the Kornblum Development and what it would receive from any private development. Exhibit 20 at pp. 9–10. To alleviate the concerns about traffic and schools, the developer negotiated with the Century Freeway Housing Program to commit all 36 of the development's one bedroom units to senior citizens, who will not have school age children or cause much traffic at peak hours. Exhibit 20 at p. 4. Finally, the developer explained that the State requires him to create a reserve of 1% of the construction cost to provide for ongoing maintenance costs and that HCD will inspect the premis-

es yearly and order the owner to make any necessary repairs out of the reserve fund. Exhibit 20 at pp. 53–59.

At the close of the November 13 hearing, the Council members requested the City Manager to research the tax, school, traffic, and maintenance issues. In a letter to the City Council dated November 23, 1984, the City Manager essentially confirmed what the developer had stated at the November 13 hearing. Exhibit 16. He reported that the schools in the Moneta area could accommodate between 150 and 200 more students and that the Kornblum Development combined with another 40 unit replenishment development would produce approximately 200 students. *Id.* at p. 1. He also noted that the developer had agreed to participate in a "school development assessment" if the city imposed it on all new residential developments larger than a single family house. *Id.* at p. 2. The Manager reported that only public housing authorities, such as the Hawthorne Housing Authority, could purchase the Kornblum Development from the State and not pay taxes on it. *Id.* at p. 3. He also confirmed the developer's assertion that HCD conducts an annual inspection to determine when the 1% maintenance fund should be expended. *Id.*

---

**11.** Of the five who addressed the City Council, the two most vocal residents expressed vehement opposition to the low-income status of the future tenants. Mr. Raymon Sulser argued that

> We have developments similar to this—although it's not called the same thing. I'm talking about HCD projects and everything. One of them in [sic] as was stated at the last meeting, is Nickerson Gardens. You know the crime that they have in there. You're going to have some of the same problems in this project that's underway if it is built.
> . . . .
> [I]t's like a person going out and buying a Mercedes that can't afford to make the payments on it. It's not going to be around long.
> . . . .
> I—I think we've got enough of low-income housing in the city. We've got a lot of HUD projects that a lot of these other cities don't have. They fought it, and kept it out, and we didn't. And I would like to see you deny this project. There's—they can go to other—I told

them of, at the last meeting, of a piece of ground, that's not actually in this city, that is going to be up for sale. Let them build it there. I think we've got enough of it.

Exhibit 20 at pp. 19, 14, 22.

Mr. Gene Williams remarked that

> these windows are going to be hanging out; the screens are going to be hanging off. There's going to be graffiti. The little shrubs they're going to plant in the parks are going to be litter on Kornblum Avenue. . . . We don't —We don't need any more hoodlums in our neighborhood. . . . So it's just going to be a mess over in our neighborhood. But if, if they want to get it up there in the high rent price bracket, why we can probably get enough protection over there to handle those people.
> . . . .
> I think that if they put units in that rent for $1000 per unit that you get your higher class people in there.

Exhibit 20 at pp. 41–42.

At the hearing on November 26, both Kornblum's developer and the executive director of the Century Freeway Housing Program spoke at length to clarify misconceptions about the mechanics of the low-income rental program and to express their willingness to accommodate Hawthorne's concerns. Exhibit 21 at pp. 7–12, 14–26.

At the end of the discussion, Councilmember Ainsworth stated that she still desired to deny the Kornblum applications for school overcrowding and traffic reasons. Exhibit 21 at pp. 29–30. Councilmember York responded:

> If—if we just let the area alone to our own developers, eventually they're going to be developing that area. We're going to have an additional impact whether it's by this development, or additional development down the line. That's why I'm saying we have more at issue to concern ourself with here besides just this—just this one project. The project as it sits on itself here looks—looks beautiful. But there are these other problems about density, school impact—impacting that's going to occur, I think whether this project gets passed or not. I think that a lot of the problems that you're—that's [sic] you're citing are—are going to be affected not just with this project, but with future projects down the line, whether they're smaller projects than this one, or a similar size project.

*Id.* at pp. 30–31.

Mayor Hocker agreed that "anything that we put over there is going to put in a great deal of traffic. I think anything that's other than this is going to bring even more traffic." Exhibit 21 at p. 32. An unidentified councilmember added that "my problem with this whole project is you keep talking about the impact on the schools, and I'm not convinced that by shutting this project down is going to alleviate the impacting of the schools. Because if this project isn't built, there are going to be

other projects crop up, and we are going to have more school children in the area, and I don't see any way for us to get around that." *Id.* at p. 37.

Despite these comments of her co-councilmembers, Councilmember Ainsworth moved to uphold the recommendations of the Planning Commission. Exhibit 21 at p. 31. Councilmember Bookhammer seconded the motion, but explained his decision. He stated that his "main goal is to commit, create to some. additional senior citizen housing which it appears that we've done. Not come close to, but have done." *Id.* He voted against the project, however, because "even after all of these comments have been made and the things that were given to the city by the developer, I still hear an adamant—referendum from the residents of the neighborhood that they still do not want this project, and they're the ones who have to live with the project being in their neighborhood. ... I have to go along with that." *Id.* at pp. 31–32. Councilmember Ainsworth agreed that "it's like Councilman Bookhammer said. The people in the community don't want it." *Id* at pp. 34–35.

When the issue was put to a vote, Councilmembers Ainsworth, Bookhammer, and York voted against the project, York admitting that he was voting "against my better judgment." Exhibit 21 at pp. 41–42. Only Mayor Hocker voted in favor of the project. Councilmember Ainsworth concluded that "They can fight City Hall and be heard. I think tonight they've felt that they have been heard, and I appreciate it." *Id.* at p. 42.

In its resolutions denying the applications, the City Council did not mention the public opposition, but gave the following reasons for its decisions:

(1) the proposed lot split would create a parcel with continued use for a wood frame single family dwelling and represent poor lot configuration;[12]

---

**12.** At the November 13 hearing, the developer tried to clear up any misconceptions concerning the house currently on the property:

> The 6,000 foot lot, which is a separate parcel on our parcel map, is to be included in the development. It is presently occupied as part of the nursery business. They are going to

(2) proposed zoning for the parcels would leave parcels one and four zoned H (horticultural) and is contrary to principles of good planning;[13]

(3) the proposed development is in an area designated by the Moneta Gardens Land Use Plan for medium density residential use, and the proposed site development plan would be high density residential use;[14]

(4) the development would contribute to overcrowding of schools;[15]

(5) the development would create undue traffic congestion, noise and lack of adequate open space;[16]

(6) the development is inconsistent with applicable and specific general plans;[17]

(7) the development encourages random and incompatible land uses and discourages highest and best land use;[18]

(7) the site is not physically suitable for the proposed density of the development;[19]

(8) the development would be materially detrimental to the public welfare by adding unmitigated traffic congestion, noise, and other adverse conditions associated with overcrowding and would be injurious to property and improvements in the vicinity

> move the nursery business to the El Segundo frontage and abandon that house. At that time, the house will be torn down and the area with the landscaping will be contributed to the project.
> Exhibit 20 at p. 49.

**13.** In response to concerns about leaving one half of the approximately ten acre site zoned H (horticultural), the developer prepared a plan to develop commercially the 5 acres that run along El Segundo Boulevard. He offered to present the plan at the November 13 hearing, but was not given the opportunity. Exhibit 20 at pp. 3–4.

**14.** The Planning Department, the agency that deals with the city's zoning matters on a daily basis, found the Kornblum development compatible with the planned development in the Moneta Garden Area:

> Good planning states that the use of property shall be in conformance with a "Plan." The proposed Lot Split, Change of Zone and Site Development is located within the Moneta Gardens Land Use Area. The Moneta Plan identifies the land use for the subject property as medium density.
> The Moneta Gardens Plan for land use was predicated on the assumption that a lower density was needed to keep the area from being adversely impacted by large apartment complexes. However, in staff's opinion, commercial uses along El Segundo Boulevard, a major traffic artery, would be the highest and best use. As such, staff will be recommending that the Planning Commission initiate the commercial zoning of the property fronting upon El Segundo Boulevard.
> If the zoning of the parcels along El Segundo Boulevard occur, then Parcels 2 and 3, if zoned medium density, would become transitional lots. As such, the permitted density would be one unit per 1250 square feet. However, the applicant's site development

> plan proposes a density of 1998 square feet per unit.
> *Staff analysis of the unit design and project density finds it to be a good example of a medium density development that adequately mitigates the overpowering mass of typical two and three story apartment developments in the area.*
> Exhibit 9 at pp. 3–4 (emphasis added).

**15.** Although it is true that the Kornblum Development would increase the enrollment in the schools servicing the Moneta Gardens Area, the Superintendent of Schools's most recent declaration states that the schools could accommodate 159 more students and that Kornblum will add 119 students. Exhibit 200 at pp. 4–5.

> The real problem is Hawthorne's approval of 795 other new housing units in the Moneta Gardens Area which, in conjunction with Kornblum, will overcrowd the schools. Exhibit 200 at p. 4. The City Council simply singled out Kornblum as the culprit. The School District "is not opposed to the particular development known as the Kornblum project," but "to the intense and rapid growth which has taken place in the Moneta Gardens area." *Id.* at p. 5.

**16.** There was absolutely no evidence presented to the City Council concerning traffic, noise, or lack of open space.

**17.** *See supra* notes 13–14.

**18.** *See supra* notes 13–14.

**19.** The Planning Department noted that although the permitted density would be one unit per 1250 square feet, the Kornblum development will have one unit for 1998 square feet. Exhibit 9 at p. 4. At the November 26 hearing, Mayor Hocker noted that the Kornblum Development was one-third less dense than other developments in the area. Exhibit 21 at p. 34.

of the lot split and to adjoining and adjacent properties;[20] and

(9) the development would defeat the intent and purposes of the city's zoning ordinance.[21] *See* Exhibits 12–14.

In response to Hawthorne's actions on the Cerise and Kornblum developments, the plaintiffs in this lawsuit submitted a motion for leave to file a supplemental complaint to add allegations that Hawthorne[22] had illegally refused to permit the construction of two replenishment rental developments within its borders. At the same time, the plaintiffs filed a motion to enjoin preliminarily Hawthorne's refusal to permit the construction of the two developments. Hawthorne opposed both motions and submitted to Goldrich & Kest a compilation of 52 alternate parcels of property on which to build Century Freeway-related housing. Exhibit 202 at p. 7, exhibits B & C.

On April 10, 1985, this court granted plaintiffs leave to file the supplemental complaint[23] and also permitted the California Department of Housing and Community Development, the California Department of Transportation, and Goldrich & Kest,

Inc., to intervene in the supplemental action.

The supplemental complaint and motion for preliminary injunction asserted five claims for relief[24] against the City of Hawthorne and its officials for their actions in imposing the 35% limitation on the number of units in the Cerise Development that may be rented to low income tenants and in denying the lot split, change of zone, and site development applications for the Kornblum Development:

1. violation of the Supremacy Clause of the United States Constitution;

2. violation of the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3601–3631;

3. violation of the Fourteenth Amendment to the United States Constitution;

4. violation of California Government Code § 65008; and

5. violation of Equal Protection Clause, Article I, § 7 of the California Constitution.[25]

---

**20.** *See supra* note 16.

**21.** On the contrary, it appears that the development would further the city's policy of "encourag[ing] innovative uses of federal and other programs that will provide housing." Exhibit 2 at p. 23. Hawthorne's Housing Element, prepared by the Planning Department, notes that "[r]apid increases in new and existing housing costs, as has happened in the past few years, have resulted in the inability of lower income households to successfully compete for decent, affordable housing." *Id.* at p. 19. Therefore, "[o]ne of the City of Hawthorne's policies is to expand housing opportunities for lower income households but avoid concentration of such groups." *Id.* Because "those elderly persons on fixed incomes who do not own a home, or bought one late in life, are in the greatest need[,] ... [o]pportunities to provide housing for elderly persons are of highest priority." *Id.*

The Housing Element states that 286 new units will have to be built yearly to meet Hawthorne's housing needs and that only 10.3 acres of residentially zoned land are currently vacant. *Id.* at pp. 24, 19. But "[t]here are approximately 19 acres of land zoned for horticultural uses, generally located within existing residential neighborhoods. These properties, if rezoned to R-3 or R-4, would provide additional capacity

for 780 dwelling units. The Planning Department will continue to support development proposals for the conversion of horticultural properties to residential uses." *Id.* at p. 25.

**22.** The supplemental defendants include the City of Hawthorne; the City Council of the City of Hawthorne; and Betty J. Ainsworth, Steve Andersen, Chuck Bookhammer, Guy J. Hocker, and David M. York, as members of the City Council. The court will hereinafter refer to the supplemental defendants as "Hawthorne" or "the city."

**23.** On April 15, 1985, the court issued an order detailing its reasons for granting the plaintiffs' motion to file the supplemental complaint.

**24.** The plaintiffs also alleged a violation of California Government Code § 65583 (West 1983 & Supp.1985), but dropped this cause of action before trial. *See* Pre-Trial Conference Order at pp. 15–18.

**25.** The intervenors Goldrich & Kest, the California Department of Transportation, and the California Department of Housing and Community Development joined only in the Supremacy Clause, California Government Code, and California Constitution claims for relief.

Pursuant to Fed.R.Civ.P. 65(a)(2), the parties agreed to advance the trial of the supplemental action on the merits and consolidate it with the hearing of the application for a preliminary injunction. At a bench trial on April 17, 1985, the parties submitted all of their evidence in the form of documents and declarations. The court admitted all of the proffered documents into evidence except Exhibits 5 & 11, which it held to be inadmissable hearsay. After both sides rested, the court heard oral argument on behalf of all of the parties and requested them to file post-trial briefs.

After close review of the briefs and all of the documentary evidence, on May 10, 1985, the court ordered the parties to further brief the question of the plaintiffs' and intervenors' standing. On May 24, 1985, the court reopened the proceedings and requested the plaintiffs and state intervenors to compile information on the racial and economic composition of the Hawthorne census tracts affected by the freeway.[26]

In response to the court's requests, the plaintiffs moved to add four additional plaintiffs to eliminate any question concerning their standing to bring the suit. In addition, the plaintiffs and state intervenors went to two separate sources to gather the requested racial and economic data. First, the plaintiffs conducted a telephone and door-to-door survey of the Hawthorne displacees currently residing in the affected census tracts. Second, Caltrans and HCD summarized information in existing Caltrans files on the displacees and supplemented the file search with phone calls and personal interviews. The plaintiffs and intervenors thus presented three separate reports on the racial and economic composition of the affected census tracts: (1) the 1980 U.S. Census data, which they originally submitted with their motion for a preliminary injunction, (2) the results of the telephone and door-to-door survey, and (3) the summary of Caltrans's files.

The City of Hawthorne also summarized the information in Caltrans's files and submitted its summary in addition to 1980 U.S. Census data on the racial composition of the census tracts in which the 52 alternate parcels are located.

On July 24, 25, and 30, 1985, the trial resumed. The court heard oral argument on the plaintiffs' motion to add additional plaintiffs and granted the motion. The court also heard testimony and oral argument on the admissibility in evidence of Exhibit 44, plaintiffs' summary report of Dr. James H. Johnson's social survey; Exhibit 45, plaintiffs' and state intervenors' separate summaries of the information contained in Caltrans's active files on Hawthorne displacees; Exhibit 46, plaintiffs' and state intervenors' charts summarizing the results of the numerous separate summaries contained in Exhibit 45; and Exhibit 201, supplemental defendants' summary of Caltrans's files. At the conclusion of the trial, the court ordered the exhibits admitted into evidence.[27] The court then ordered the case submitted.

---

**26.** On May 24, 1985, the court issued an order requesting the plaintiffs and state intervenors to compile the following information:

1. The racial composition of the Hawthorne displacees in each of the four census tracts affected by the freeway and of the residents in each of the two tracts in which the Cerise and Kornblum Developments are proposed to be built.
2. The percentage of Hawthorne displacee households in each of the four affected tracts that are low income households.
3. The percentage of the low income Hawthorne displacee households in each of the four affected tracts that are minority households.

4. The percentage of low income Hawthorne displacee households in each of the four affected tracts that would desire to be relocated in a Century Freeway housing project in Hawthorne.

The court also required that plaintiffs and state intervenors brief the issue whether the requested information was admissible in evidence.

**27.** On August 14, 1985, the court issued a "minute order" detailing its reasons for admitting exhibits 44, 45, and 46 into evidence. This order is attached at the end of this opinion as "Appendix A."

## JURISDICTION

■ This court has jurisdiction of the Supremacy Clause and Fourteenth Amendment causes of action pursuant to 28 U.S.C. § 1343(a)(3) (1982) [28] and of the Title VIII cause of action pursuant to 28 U.S.C. § 1343(a)(4) (1982).[29] Because the federal claims "have substance sufficient to confer subject matter jurisdiction on the court" and the state and federal claims "derive from a common nucleus of operative fact," this court also has pendent jurisdiction of the California Government Code and California Constitution causes of action. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). *See Aragon v. Federated Department Stores*, 750 F.2d 1447, 1457 (9th Cir.1985).

■ The plaintiffs have standing to bring the Title VIII cause of action [30] under the principles enunciated in *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979). In *Gladstone,* the Supreme Court held that Congress, in enacting Title VIII, "expand[ed] standing to the full extent permitted by Art. III." *Id.* at 100, 99 S.Ct. at 1608. To establish standing, the Title VIII plaintiff must merely show the Article III minima—i.e., that he "suffered 'a distinct and palpable injury to himself' ... that is likely to be redressed if the requested relief is granted." *Id.* (quoting *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976)); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 375–76, 102 S.Ct. 1114, 1122–23, 71 L.Ed.2d 214 (1982) ("the only requirement for standing to sue under [Title VIII] is the Art. III requirement of injury in fact.").

■ In the instant case, three individual low-income minority plaintiffs who will be displaced by the Century Freeway testified that they would like to be relocated in affordable housing in Hawthorne. Ms. Rose Hillman, a Black Hawthorne resident with an income of $12,000, testified that she would like to be relocated in the same vicinity as her current residence and would apply to live at the Kornblum and Cerise Developments, if they are built. R.T. 36–39 (July 24, 1985). Mr. Earl Wright, another Black Hawthorne resident with an income of approximately $12,000, also testified that he would like to be relocated in the same vicinity and would apply to live at the proposed Kornblum and Cerise Developments, although, if he could afford it, he would prefer to own a house instead of renting an apartment. R.T. 43–46. Finally, Mr. Pablo Zapeta, an Hispanic Hawthorne resident with a family income of approximately $14,000, testified that he would like to be relocated in the Hawthorne area and would apply to live in the proposed Cerise and Kornblum Developments. R.T. 56–59. In addition, Mr. Boris Storzch, of the Century Freeway Housing Program, testified that Hillman, Wright, and Zapeta would be eligible to live in either the Cerise or Kornblum Developments under the Century Freeway Housing Program Relocation Apartment standards. R.T. 76–77.

**28.** Section 1343(a)(3) provides that the district courts "shall have original jurisdiction of any civil action authorized by law to be commenced by any person ... [t]o redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States, or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States...." 28 U.S.C. § 1343(a)(3) (1982).

**29.** Section 1343(a)(4) provides that the district courts "shall have original jurisdiction of any civil action authorized by law to be commenced by any person ... [t]o recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote." 28 U.S.C. § 1343(a)(4) (1982).

**30.** The plaintiffs allege that Hawthorne violated section 3604, which states that it is unlawful to "make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin." 42 U.S.C. § 3604(a) (1982). The plaintiffs therefore brought their action under section 3612, which provides that "[t]he rights granted by section [ ] ... 3604 ... of this title may be enforced by civil actions in appropriate United States district courts without regard to the amount in controversy...." 42 U.S.C. § 3612(a) (1982).

Hawthorne's denial of the Kornblum applications and imposition of a 35% quota on the number of units that can be rented to low income tenants in the Cerise Development jeopardizes the ability of Hillman, Wright, and Zapeta to relocate in Hawthorne. As noted above, there are, at most, only 128 units of relocation housing currently available in Hawthorne. If more relocation housing isn't built soon—before Hillman, Wright, Zapeta, and 1,100 other Hawthorne families are displaced—the displacees will have to move outside of Hawthorne to find affordable housing. These facts constitute a "distinct and palpable injury." [31] *Gladstone*, 441 U.S. at 100, 99

S.Ct. at 1608. Because their action "focuses on [two] particular project[s] and is not dependent on speculation about the possible actions of third parties not before the court," the plaintiffs have also shown that their injury is likely to be redressed if this court grants the requested relief. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264, 97 S.Ct. 555, 562, 50 L.Ed.2d 450 (1977). Therefore, the court finds that the plaintiffs have standing to bring their claim under Title VIII.[32]

■ For the same reasons, the court finds that the plaintiffs have standing to

---

**31.** Hawthorne contends that to prove injury, Hillman, Wright, and Zapeta must desire to be relocated on the particular blocks of the particular streets where the Kornblum and Cerise Developments are proposed to be built and that no other location inside or outside Hawthorne would be acceptable to them. Hawthorne also contends that Hillman, Wright, and Zapeta must desire to rent a residence as their first choice, and cannot prefer ownership, to demonstrate that failure to build the Kornblum and Cerise Developments injures them.

The court rejects both of these contentions. The plaintiffs need not show that the only place they would like to live is in the Cerise or Kornblum Developments. They need only show that they would like to be relocated in Hawthorne, that affordable housing in Hawthorne is scarce, and that they would like to live in either of the two developments, if built.

In Hawthorne's own "Housing Element," Hawthorne's Planning Department admits that "[r]apid increases in new and existing housing costs, as has happened in the past few years, have resulted in *the inability of lower income households, to successfully compete for decent, affordable housing.*" Exhibit 2 at p. 19 (emphasis added). Ms. Hillman testified that she had been looking for affordable housing in Hawthorne for approximately six months and had been unable to find any. R.T. 40 (July 24, 1985). The fact that the plaintiffs would be equally happy living in a part of Hawthorne other than the Moneta Gardens Area does not eliminate the injury caused by frustration of the two developments if there is not sufficient affordable housing in other parts of Hawthorne to absorb the displacees.

Neither does the fact that the plaintiffs may, like most people, prefer to own a residence, rather than to rent one, erase the injury if there are no affordable residences which they could purchase in Hawthorne. Mr. Wright testified that he had been looking to purchase an affordable residence in Hawthorne for over a year

and had been unable to find anything within his income. R.T. 45–46.

Therefore, despite Hawthorne's arguments to the contrary, the court finds that plaintiffs have demonstrated that Hawthorne's frustration of the two developments has sufficiently injured their ability to relocate in Hawthorne to give them standing to bring a suit under Title VIII.

**32.** Plaintiffs also alleged that the NAACP had representational standing to bring the Title VIII claim because "NAACP has members who are minority and/or low income displacees residing in the City of Hawthorne and who are adversely affected by the actions of the City of Hawthorne in reducing replacement housing opportunities for displacees." Supplemental Complaint, Exhibit A at p. 5.

But the only NAACP member who testified on behalf of the plaintiffs, Ms. Minnie Hadley, is not a displacee. Instead, she is a Hawthorne resident who is concerned that Hawthorne's denial of the Kornblum and Cerise Developments would deprive her of the social benefits of living in an integrated community. The Supreme Court has acknowledged that such an injury is sufficient to confer standing to bring a Title VIII claim. *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 109–11, 99 S.Ct. 1601, 1612–14, 60 L.Ed.2d 66 (1979). But the plaintiffs have not presented evidence proving that the denial of the two developments would in fact deprive Hadley of the benefits of an integrated society.

Hawthorne is a large city and there is no evidence that Hadley lives in the Moneta Gardens Area, where the two proposed developments will be built. Although Hadley testified that she wanted the Black displacees to remain in Hawthorne so that Black representation in the City government would not be diminished, R.T. 67–68 (July 24, 1985), the Cerise and Kornblum Developments have a total of only 128 units, 70 (55% of 128) of which would be set

bring their claim under subsections (b) and (c) of California Government Code § 65008, which prohibit discrimination against a residential development on the basis of the race or low income level of the intended tenants.[33] In addition, intervenor Goldrich & Kest has standing to bring a claim under subsections (b) and (c) as the developer of one of the residential developments discriminated against.

■ The plaintiffs also have standing to bring a claim under subsection (d) of California Government Code § 65008,[34] which prohibits a city from imposing requirements on a development financially assisted by the state or federal governments different from those imposed on nonassisted developments. Because the plaintiffs are clearly the intended beneficiaries of the state's financial assistance, they have shown a "distinct and palpable injury" as a result of the city's requirement that the developer record a covenant providing that no more than 35% of the units in the Cerise Development may be rented to low income tenants: the State has refused to finance the development if such a covenant is recorded, and the developer will not build the

aside for low income residents. It is therefore speculative whether failure to build the developments would have any significant effect on the character of Hadley's society or Black representation in the City government.

**33.** *Section 65008 provides in pertinent part:*
 (b) No city, county, or city and county shall, in the enactment or administration of ordinances pursuant to this title, prohibit or discriminate against any residential development or emergency shelter because of the method of financing or the race, sex, color, religion, national origin, ancestry, or age of the intended occupants of the development or shelter.
 (c) No city, county, or city and county shall, in the enactment or administration of ordinances pursuant to this title, prohibit or discriminate against a residential development or emergency shelter because the development or shelter is intended for occupancy by persons and families of low and moderate income....
 Cal.Gov.Code § 65008 (West 1983 & Supp.1985).

**34.** Subsection (d) of section 65008 provides that:
 No city, county, or city and county may impose different requirements on a residential development or emergency shelter which is

development without state assistance. Moreover, the state intervenors, California Department of Housing and Community Development and California Department of Transportation, have standing because they are the state agencies providing the residential development financial assistance referred to in section 65008(d).[35]

## ANALYSIS

I. Hawthorne's imposition of the 35% limitation on number of units in the Cerise Development that may be rented to low income tenants and its denial of the lot split, zone change, and site development applications for the Kornblum Development violate Title VIII, 42 U.S.C. §§ 3601–3631.

Under Title VIII, commonly known as the Fair Housing Act, it is unlawful to "make unavailable ... a dwelling to any person because of race, color, religion, sex, or national origin." 42 U.S.C. § 3604(a) (1982).

The circuits that have addressed the issue have agreed that the phrase "because of race" does not require proof of discrimi-

subsidized, financed, insured, or otherwise assisted by the federal or state governments or by a local public entity ... than those imposed on nonassisted developments....
Cal.Gov.Code § 65008(d) (West 1983 & Supp. 1985).

**35.** As indicated by the following discussion in the body of this memorandum and order, this court finds liability on both of the statutory claims for relief. Therefore, it does not reach the state and federal constitutional issues and need not determine whether the plaintiffs or intervenors have standing to bring these claims. "It is well settled that a court should refrain from deciding a constitutional issue when a non-constitutional ground for decision is available." *Gutierrez v. INS*, 745 F.2d 548, 550 (9th Cir.1984) (citing *Wolston v. Readers' Digest Association, Inc.*, 443 U.S. 157, 161 n. 2, 99 S.Ct. 2701, 2704 n. 2, 61 L.Ed.2d 450 (1979); *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 341, 56 S.Ct. 466, 480, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); *Siler v. Louisville and Nashville Railroad Co.*, 213 U.S. 175, 193, 29 S.Ct. 451, 455, 53 L.Ed. 753 (1909); *Montana Chapter of Association of Civilian Technicians, Inc. v. Young*, 514 F.2d 1165, 1167–68 (9th Cir. 1975) ).

natory intent; rather, proof of discriminatory effect may be sufficient to demonstrate a violation of the Fair Housing Act. *See Smith v. Town of Clarkton,* 682 F.2d 1055, 1065 (4th Cir.1982); *Resident Advisory Board v. Rizzo,* 564 F.2d 126, 146–48 (3d Cir.1977), *cert. denied,* 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978); *Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 558 F.2d 1283, 1289–90 (7th Cir.1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978); *United States v. City of Black Jack,* 508 F.2d 1179, 1184–85 (8th Cir.1974), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694, *reh'g denied,* 423 U.S. 884, 96 S.Ct. 158, 46 L.Ed.2d 115 (1975).

■ Once the plaintiff has established a prima facie case by demonstrating racially discriminatory effect, the burden shifts to the defendant to demonstrate that non-discriminatory reasons justify its conduct. *See Rizzo,* 564 F.2d at 149; *Black Jack,* 508 F.2d at 1185. If the defendant offers no valid non-discriminatory reason for its actions, then the plaintiff has succeeded in proving a Title VIII violation. If the defendant does offer valid non-discriminatory reasons, the court must determine whether they are substantial enough to justify the racially discriminatory effect. *See Smith,* 682 F.2d at 1065; *Rizzo,* 564 F.2d at 148–49; *Arlington Heights,* 558 F.2d at 1293; *Black Jack,* 508 F.2d at 1186–87.

The circuits have applied different standards, however, in determining how important a discriminatory effect is to proving a prima facie case and in determining whether the defendant's proffered justifications are sufficient to rebut the plaintiff's prima facie case. Although the Ninth Circuit has not yet addressed the proper standards to apply, *see Halet v. Wend Investment Co.,* 672 F.2d 1305, 1311 (9th Cir.1982), this court finds that Hawthorne would be liable under any of the standards the other circuits have applied.

### A. *Prima facie case.*

■ The Third and Eighth Circuits seem to take the position that proof of discriminatory effect alone is always sufficient to establish a prima facie Title VIII violation. *Rizzo,* 564 F.2d at 148; *Black Jack,* 508 F.2d at 1184–85. In contrast, the Seventh Circuit has held that proof of discriminatory effect without a showing of discriminatory intent establishes a Title VIII violation only under some circumstances. *Arlington Heights,* 558 F.2d at 1290.

The *Arlington Heights* court listed four "critical factors" in determining whether proof of discriminatory effect is sufficient in each particular case: "(1) how strong is the plaintiff's showing of discriminatory effect; (2) is there some evidence of discriminatory intent, though not enough to satisfy the constitutional standard of *Washington v. Davis* [426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)]; (3) what is the defendant's interest in taking the action complained of; and (4) does the plaintiff seek to compel the defendant to affirmatively provide housing for members of minority groups or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing." *Id.* at 1290. The Fourth Circuit has also adopted this four factor analysis. *Smith,* 682 F.2d at 1065.

Without deciding whether the Seventh Circuit's stricter requirements for establishing a Title VIII prima facie case are correct, this court finds that the plaintiffs in the instant case not only have shown discriminatory effect, but also have made a sufficient showing on two of the other three factors under the *Arlington Heights* analysis to establish a prima facie case. The court will now address each of the four factors.

(1) *Effect.* The evidence clearly demonstrates that Hawthorne's actions in imposing the 35% limitation on the Cerise Development, knowing that such a limitation would prevent HCD from funding the project, and in denying the applications for zone change, lot split, and site development on the Kornblum Development had a racially discriminatory effect. The following chart summarizes the results of the plaintiffs' survey (Exhibit 44), the plaintiffs' and

state intervenors' summary of the separate summaries of Caltrans's files (Exhibit 46), the plaintiffs' presentation of 1980 U.S. Census data (Exhibits 50–A to 50–C), and the supplemental defendants' summary of Caltrans's files (Exhibit 214):

1. *Racial composition of Hawthorne displacees in census tracts affected by the Freeway and of residents in tracts where Cerise and Kornblum Developments are proposed.*

A. *Tracts affected by the Freeway.*

**Plaintiffs' Social Survey** (Exhibit 44 at p. 9)

26.9% White, 35.2% Black, 26.9% Hispanic, 7.5% Asian or Pacific Islander, 2.4% Other. Total Black and Hispanic = 62.1%. Total Non-White = 73.1%.

**Plaintiffs' and State Intervenors' Summary of Caltrans's Files** (Exhibit 46 at p. 2)

23.2% White, 37.4% Black, 29.9% Hispanic, 4.4% Asian or Pacific Islander, 5.0% Other. Total Black and Hispanic = 67.3%. Total Non-White = 76.8%.

**Plaintiffs' Summary of 1980 U.S. Census Data** (Exhibit 50–A at p. 2)

21% White, 54% Black, 21% Hispanic, 3% Asian or American Indian, 1% Other. Total Black and Hispanic = 75%. Total Non-White = 79%.

**Supplemental Defendants' Summary of Caltrans's Files** (Exhibit 214 at p. 1)

Ethnicity was known in 65.4% of the files reviewed. Of those files, 8.2% were White, 27% Black, 42% Hispanic, 2.6% Asian, 19% Other. Total Black and Hispanic = 69%. Total Non-White = 91.8%.

B. *Tracts where Cerise and Kornblum Developments are proposed.*

**Plaintiffs' Summary of 1980 U.S. Census Data** (Exhibit 50–B)

*Kornblum:* 59% White, 10% Black, 23% Hispanic, 8% Asian or American Indian, 1% Other. Total Black and Hispanic = 33%. Total Non-White = 41%.

*Cerise:* 48% White, 10% Black, 31% Hispanic, 10% Asian or American Indian, 1% Other. Total Black and Hispanic = 41%. Total Non-White = 52%.

2. *Percentage of Hawthorne displacee households that are low income households.*

**Plaintiffs' Social Survey** (Exhibit 44 at p. 10)

54.5% low income.

**Plaintiffs' and State Intervenors' Summary of Caltrans's Files** (Exhibit 46 at p. 3)

59.3% low income.

**Plaintiffs' Summary of 1980 U.S. Census Data** (Exhibit 50–C)

35% low income.

**Supplemental Defendants' Summary of Caltrans's Files** (Exhibit 214 at p. 1)

Income was known in 58.6% of the files. Of those files, 52% were low income.

3. *Percentage of low income Hawthorne displacee households that are minority households.*

**Plaintiffs' Social Survey** (Exhibit 44 at p. 11)

Total Black & Hispanic = 63.8%.
Total Non-White = 71.7%.

**Plaintiffs' and State Intervenors' Summary of Caltrans's Files** (Exhibit 46 at p. 4)

Total Black & Hispanic = 73.6%.
Total Non-White = 78.5%.

4. *Percentage of low income Hawthorne displacee households that desire to relocate in a Century Freeway housing project in Hawthorne.*

**Plaintiffs' Social Survey** (Exhibit 44 at p. 12)

67.4%

**Plaintiffs' and State Intervenors' Summary of Caltrans's Files** (Exhibit 46 at p. 5)

68.1%

**Supplemental Defendants' Summary of Caltrans's Files** (Exhibit 214 at p. 1)

Relocation preference was known in 34.9% of the files. Of those files,

27.8% indicated a desire to relocate in Hawthorne.

The four sources of evidence indicate that 62.1% (social survey) to 75% (U.S. Census) of the displacees are Black and Hispanic, and 73.1% (social survey) to 91.8% (supplemental defendants' file summary) are non-White. Although the four sources of evidence vary widely on the percentage of the displacee households that are low income households—from a low of 35% (U.S. Census) to a high of 59.3% (plaintiffs' file summary)—both the social survey and the plaintiffs' summary of Caltrans's files indicate that the percentage of the low income households that are minority households is roughly the same as the percentage of the entire group of displacee households that are minority households: 63.8% (social survey) to 73.6% (plaintiffs' file summary) Black and Hispanic, and 71.7% (social survey) to 78.5% (plaintiffs' file summary) non-White. Therefore, even though the 1980 U.S. Census data indicates that only 35% of the displacee households are low income, *see* Exhibit 50–C, the court can assume that the Census data, if available, would show approximately 75% of those low income households as Black and Hispanic and 79% of those households as non-White. *See* Exhibit 50–A at p. 2.

The Seventh Circuit observed in *Arlington Heights* that "[t]here are two kinds of racially discriminatory effects which a facially neutral decision about housing can produce. The first occurs when that decision has a greater adverse impact on one racial group than on another." 558 F.2d at 1290. In the instant case, roughly two-thirds of the low income displacees are members of an ethnic minority.[36] The evidence also shows that roughly two-thirds of the displacees would apply to live in a state-assisted Century Freeway housing project in Hawthorne.[37] Because two-thirds of the low-income displacees are members of an ethnic minority, failure to build the Cerise and Kornblum Developments, which provide subsidized housing for low-income displacees, impacts minority displacees twice as hard as it impacts white displacees. This showing alone is enough to establish a racially discriminatory effect. *See Smith*, 682 F.2d at 1061, 1065 (there is "no doubt that the black population ... was adversely affected by the termination of the housing project" where "56% of all poverty-level families in the county are black, and 69.2% of all black families in [the county] are presumptively eligible for low income housing"); *Arlington Heights*, 558 F.2d at 1288 (because "a greater number of black people than white people in the Chicago metropolitan area satisfy the income requirements for federally subsidized housing," the Village's refusal to permit construction of a low income housing project had a racially discriminatory effect).

In addition, there is a second type of racially discriminatory effect that a facially neutral decision about housing can produce. This is "the effect which the decision has on the community involved; if it perpetuates segregation and thereby pre-

**36.** In contrast, the 1980 U.S. Census data on the two tracts where the Kornblum and Cerise Developments would be built shows that roughly four-tenths of the residents of these tracts are members of an ethnic minority—approximately one-half of the percentage of minority persons in the affected tracts. *See* Exhibit 50–B.

**37.** On the issue of the percentage of Hawthorne displacees that desire to relocate in Hawthorne, the results of the social survey and plaintiffs' file summary were within 1% of each other: the social survey indicated that 67.4% of the displacees would like to relocate in Hawthorne, Exhibit 44 at p. 12, and the file summary indicated that 68.1% would like to relocate in Hawthorne, Exhibit 46 at p. 5.

In contrast, Hawthorne's file summary indicated that only 34.9% of the displacees would like to relocate in Hawthorne. Exhibit 214 at p. 1. The court finds this result non-probative because, in compiling its statistics, Hawthorne excluded responses that included Hawthorne in conjunction with another location—i.e., Hawthorne did not count the displacees who indicated that they would like to live in Hawthorne or Inglewood, Hawthorne or Torrance, etc. The fact that a displacee would not mind living in another location does not eliminate the injury to him from Hawthorne's failure to permit construction of affordable housing in Hawthorne if the displacee would like to relocate, among other places, in Hawthorne.

vents interracial association it will be considered invidious under the Fair Housing Act independently of the extent to which it produces a disparate effect on different racial groups." *Arlington Heights,* 558 F.2d at 1290. *See Black Jack,* 508 F.2d at 1186 (trial court erred in failing to find discriminatory effect where only 3% more Blacks were affected than Whites because the "ultimate effect" of ordinance in question was to foreclose 85% of Blacks from obtaining housing in Black Jack).

The ultimate effect of frustrating the Kornblum and Cerise Developments in the instant case is to prevent low income minority displacees from continuing to reside in Hawthorne. If affordable housing is not made available in Hawthorne to the displacees by the time they are displaced, they will have to move out of Hawthorne altogether. This is not simply a case of the city preventing non-resident minorities from moving into the city: if replenishment housing is not built in time, Hawthorne will succeed in depopulating itself of a large number of its current minority residents. Hawthorne's own "Housing Element" shows that the tracts affected by the freeway have a higher percentage of minority residents than the other tracts in Hawthorne.[38] Exhibit 2 at p. 6. The Housing

Element also acknowledges that there is a much larger percentage of minority than white residents below the poverty level[39] and that the "[r]apid increases in new and existing housing costs ... have resulted in the inability of lower income households to successfully compete for decent, affordable housing." Exhibit 2 at pp. 9, 19. With 1,104 Hawthorne families facing displacement, and at most only 128 units of replenishment housing in the process of construction in Hawthorne, the failure promptly to start construction of the two developments at issue seriously jeopardizes the ability of a large number of minority residents to continue residing in Hawthorne. Thus, the "ultimate effect" of Hawthorne's actions, like the immediate effect, is racially discriminatory. *See Rizzo,* 564 F.2d at 149 (ultimate effect of city agencies' actions in razing integrated housing for urban renewal, but failing to build replacement housing, was racially discriminatory).

(2) *Intent.* The court finds that the plaintiffs have failed to show that the City Council acted with discriminatory intent.[40] But this is "the least important of the four factors" and "should be partially discounted." *Arlington Heights,* 558 F.2d at 1292, 1294.

38. The plaintiffs submitted Hawthorne's Housing Element, prepared by Hawthorne's Planning Department, as plaintiffs' Exhibit 2. The court finds that the Housing Element is less probative on the issue of the racial composition of the four affected tracts than the social survey (Exhibit 44) or the summary of Caltrans files (Exhibit 46) because the latter two sources of evidence are more current. However, the Housing Element is the only source of evidence giving statistics on all of the tracts in Hawthorne. Based on 1980 U.S. Census Data, the Housing Element shows that the percentage of Blacks and Hispanics in the affected tracts ranges from 40.6% to 93.6%. In contrast, the tracts where the Cerise and Kornblum Developments are proposed have only 23.8% and 33.1% Black and Hispanic residents, respectively. The Housing Element shows that the other unaffected tracts in Hawthorne—i.e., tracts not in the path of the freeway—have a similarly low percentage of Black and Hispanic residents. Exhibit 2 at p. 6.

39. Presumably based on 1980 U.S. Census data, the Housing Element states that "15.4% of the Spanish population; 13.4% of the Asian popula-

tion; 9.2% of the Black population; and 7.5% of the White population is below the poverty level." Exhibit 2 at p. 9.

40. To show discriminatory intent, the plaintiffs rely primarily on a statement by a local resident, Mr. Raymon Sulser, at the November 13 hearing, that the Kornblum Development will be like "Nickerson Gardens," a predominately Black housing project in Watts. Exhibit 20 at p. 19. Even if "Nickerson Gardens" is a "code word" for minority tenants, as the plaintiffs allege, "[t]he bigoted comments of a few citizens, even those with power, should not invalidate action which in fact has a legitimate basis." *Arlington Heights,* 558 F.2d at 1292.

The plaintiffs' failure to prove discriminatory intent does not, however, preclude them from establishing a Title VIII violation if they show, in addition to discriminatory effect, that the City Council's decisions to impose the 35% limitation on the number of units in the Cerise Development that may be rented to low income tenants and to deny the rezoning, lot split, and site development applications for the Kornblum Development had no legitimate basis.

"[I]ntent, motive and purpose are elusive concepts," ... and attempts to discern the intent of an entity such as a municipality are at best problematic.... A strict focus on intent permits racial discrimination to go unpunished in the absence of evidence of overt bigotry. As overtly bigoted behavior has become more unfashionable, evidence of intent has become harder to find. But this does not mean that racial discrimination has disappeared.

*Id.* at 1290 (quoting *Hawkins v. Town of Shaw,* 461 F.2d 1171, 1172 (5th Cir.1972) (en banc) (per curiam)). The plaintiffs' failure to prove discriminatory intent in *Arlington Heights* did not preclude them from establishing a prima facie case. *Id.* at 1294. Likewise, the plaintiffs' failure to prove discriminatory intent in the instant case does not preclude them from establishing a prima facie case by a sufficient showing that the other three elements exist.

(3) *Justifications.* Because Hawthorne "is a governmental body acting within the ambit of legitimately derived authority, [this court] will less readily find that its action violates the Fair Housing Act." *Arlington Heights,* 558 F.2d at 1293. Municipalities are traditionally afforded wide discretion in zoning. *Village of Belle Terre v. Boraas,* 416 U.S. 1, 8–9, 94 S.Ct. 1536, 1540–1541, 39 L.Ed.2d 797 (1974). However, as discussed in Section B below, the court finds that Hawthorne's proffered justifications for imposing the 35% limitation on the number of units in the Cerise Development that may be rented to low income tenants and denying the zone change, lot split, and site development applications for the Kornblum Development are merely pretextual. The city's failure to show any legitimate interest in taking these actions is another factor that weighs in favor of the plaintiffs.

(4) *Prohibitory Remedy.* The plaintiffs do not seek to compel Hawthorne affirmatively to provide housing for members of minority groups, but merely to enjoin Hawthorne from interfering with private property developers who wish to provide such housing. "[T]he courts are far more willing to prohibit even nonintentional action by the state which interferes with an individual's plan to use his own land to provide integrated housing" than to "require a defendant to appropriate money, utilize his land for a particular purpose, or take other affirmative steps toward integrated housing ...." *Arlington Heights,* 558 F.2d at 1293. Thus, this factor also favors the plaintiffs.

B. *Hawthorne's justifications.*

 Because the plaintiffs have established a prima facie case, the burden shifts to Hawthorne to offer non-discriminatory reasons for its actions. The Eighth Circuit has held that to rebut a prima facie case under Title VIII, the defendant must "demonstrate that its conduct was necessary to promote a compelling governmental interest." *Black Jack,* 508 F.2d at 1185.

In *Rizzo,* the Third Circuit rejected the *Black Jack* test, holding that the defendant need only prove a compelling governmental interest when the plaintiff has made a showing of purposeful discrimination sufficient to establish a constitutional violation. *Rizzo,* 564 F.2d at 148. Analogizing to the "business necessity" test applied in Title VII cases, the *Rizzo* court formulated the following test for Title VIII cases: "a justification must serve, in theory and practice, a legitimate, bona fide interest of the Title VIII defendant, and the defendant must show that no alternative course of action could be adopted that would enable that interest to be served with less discriminatory impact." *Id.* at 149.

Hawthorne justified imposing the 35% limitation on the number of units that could be rented to low income tenants in the Cerise Development as furthering Hawthorne's policy of dispersing low income residents throughout the city. Hawthorne justified its denial of the Kornblum applications primarily because of potential overcrowding of schools, increase in traffic, increase in housing density, and loss of taxes. In addition, to disavow any discriminatory intent or impact, Hawthorne sub-

mitted to the plaintiffs and intervenors a list of 52 alternate sites on which Goldrich & Kest allegedly could build the Kornblum Development. The court finds that regardless of whether it applies the Eighth Circuit's "compelling interest" test or the Third Circuit's "legitimate, bona fide interest" test, Hawthorne has failed to meet its burden.

(1) *Dispersion.* The sole proffered reason for requiring the developer to record a covenant restricting the number of units rented to low income tenants at the Cerise Development is to promote the dispersion of low income tenants throughout the city. But Hawthorne's policy, as set forth in its Housing Element, is to "support the dispersion of low income *housing*," not low income *tenants.* Exhibit 2 at p. 23 (emphasis added). There is a subtle, but important difference between dispersing tenants so that only a few can live in any one housing project and dispersing housing projects so that only a few are located in any one neighborhood. It is the latter that Hawthorne has adopted as its policy:

> One of the City of Hawthorne's policies is to expand housing opportunities for lower income households but avoid concentration of such groups. However, the constraint to homogeneous dispersion through the city is chiefly economic. *The areas having the largest percentages of low income households are characterized as having the lowest quality, values and rents which in effect constitute affordable opportunities for such groups.* Programs available to the citizens that combat any or all of these

factors are supported by the city and will be provided whenever possible.

Exhibit 2 at p. 19 (emphasis added). Thus, Hawthorne's stated policy is to disperse housing projects into wealthier areas, not disperse tenants among housing projects. Because the Moneta Gardens Area is one of the wealthier neighborhoods in Hawthorne, the proposed Cerise Development actually furthers the city's policy by making rents affordable to qualified low income tenants.

To the extent Hawthorne is arguing that it has an unstated policy of dispersing low income tenants, it has provided no evidence of such a policy. If Hawthorne had legitimately adopted such a policy, Hawthorne would be requiring all developers to make a certain percentage of their housing units affordable to low income households.[41] On the contrary, Hawthorne has never imposed this sort of a requirement on any housing development except the Cerise Development.[42] Hawthorne's justification of "dispersion" is simply a pretext for discriminating against low income households and preventing them from moving into better neighborhoods.

(2) *Schools.* Counsel for Hawthorne has argued that the primary reason the City Council denied the applications for the Kornblum Development was to prevent the overcrowding of schools. Yet other actions by Hawthorne's officials have demonstrated the pretextual nature of this justification.

From the period of December 1, 1984, to April 15, 1985, Hawthorne's Building Department issued building permits for 18

---

**41.** To support the proposition that dispersion of low income tenants is a legitimate policy, Hawthorne cites the Sixth Circuit's opinion in *Joseph Skillken & Co. v. City of Toledo,* 528 F.2d 867 (6th Cir.1975), *vacated and remanded for further consideration in light of Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), *and Hills v. Gautreaux,* 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976), 429 U.S. 1068, 97 S.Ct. 800, 50 L.Ed.2d 786 (1977). But at the same time that the Toledo Plan Commission denied the developer's request to rezone, it "suggested that developers be required to include

some low-income homes in each new development." 528 F.2d at 877. In the instant case, Hawthorne has limited the number of low income tenants at the Cerise Development but has made no effort to ensure that the excluded low income tenants are distributed among other residential structures.

**42.** Hawthorne's Planning Department did, however, suggest that the 35% limitation be imposed on the Kornblum Development, the only other Century Freeway-related development the staff considered. Exhibit 9 at p. 7.

apartment developments, with a total of 426 apartment units, to be built in the city. Exhibit 38 at p. 2. Ten of the 18 developments, 242 of the 426 units, are located in the same Hawthorne School District school attendance zone as the proposed Kornblum Development. *Id.* at p. 3.

Moreover, on March 29, 1985, the Planning Department recommended approval of an application for a zone change from H (horticultural) to R–3 (residential) for a 49 unit apartment development in the same school attendance zone as the Kornblum Development. The Planning Department's report states that "[s]chool impact will be felt," but it is "insignificant when contrasted with the area[']s potential to develop high density residential apartments." Exhibit 38, exhibit C at p. 2. The Planning Commission approved the zone change on April 3, 1985, with no opposition from the Hawthorne School District. *Id.*, exhibit D.

Finally, 22 of the 52 alternate sites on which Hawthorne proposes that the Kornblum Development be built are located in this same school attendance zone. Exhibit 37 at p. 2.

Hawthorne cannot convincingly argue that it is concerned with overcrowding schools servicing the Moneta Gardens Area when it approves other developments in the area and suggests that Kornblum be built elsewhere in the area. The developer made every effort to minimize the Kornblum Development's effect on the schools by committing all of the single units to senior citizens and by agreeing to participate in a "school development assessment" imposed on all similar residential developments. If Hawthorne is willing to approve other developments in the area that have not made the same concessions, this court will not permit it to deny the Kornblum Development applications on the grounds of school overcrowding.

(3) *Traffic.* Another reason Hawthorne gives for denying the Kornblum applications is the increase in traffic that the development will cause. Yet no evidence was presented to either the Planning Commission or the City Council supporting the proposition that the development would unduly increase the traffic flow.

Of course, the development will create more traffic than the horticultural nursery currently occupying the parcel. But the nursery is admittedly underutilizing the parcel [43] and will be replaced by some other user, either commercial or residential. As Mayor Hocker noted, "anything that we put over there is going to put in a great deal of traffic. I think anything that's other than this is going to bring even more traffic." [44] Exhibit 21 at p. 32. Although, as noted above, there is no evidence concerning comparative traffic flows, it is obvious that a commercial development, such as a shopping center, would create more traffic than the proposed apartment development and that this lot is too deep to be feasible for other residential development, such as single family homes.

In short, this court finds increased traffic a conjectural pretext for denying the developer's applications.

(4) *Density.* Hawthorne also offers excessive housing density as a reason for denying the Kornblum applications. Again, absolutely no evidence was presented to either the Planning Commission or

---

**43.** In its Housing Element, Hawthorne's Planning Department expresses the need for land on which to build residential developments and supports proposals for the conversion of horticultural properties to residential uses where such properties are located within existing residential neighborhoods. Exhibit 2 at p. 25. The Department observed that most of the residential development is occurring in the southeast quadrant of Hawthorne, where Moneta Gardens is located, because the lots are large enough to make the economics of apartment construction feasible. *Id.* at p. 19–20.

**44.** In addition, the Kornblum developer tried to minimize the traffic flow by committing the single units to senior citizens, who will not cause much traffic at peak hours, and by repositioning the entrances and exits to the garage so that the residents will exit on a street different from the one they enter. At conference in chambers, the developer also suggested that the city consider installing a traffic light at the relevant intersection and offered to pay a portion, if not all, of the associated costs.

the City Council on the comparative density of alternate types of residential developments.

What little evidence there is in the record on this issue supports the conclusion that the project is, if anything, less dense than the alternatives. The Planning Department noted that the developer's requested zoning of the parcels to R–3 would permit 1250 square feet per unit, but the proposed development has a density of 1998 square feet per unit, ⅝ as dense as permitted. Exhibit 9 at p. 4. The staff concluded that the project was "a good example of a medium density development that adequately mitigates the overpowering mass of typical two and three story apartment developments in the area." *Id.* Because the City Council heard no facts which would disprove the staff's conclusion, the Council cannot legitimately justify denying the Kornblum applications on the ground of excessive density.

(5) *Taxes.* A number of the local residents present at the November 13 hearing apparently believed that if a non-profit organization purchased the Kornblum Development from HCD, it would pay no taxes on the building. Exhibit 20 at pp. 14, 30–31. In his follow-up letter to the City Council, the City Manager explained that only public housing authorities, such as the Hawthorne Housing Authority, could buy the building and pay no taxes on it. Exhibit 16 at p. 3. He added that although the county also has a housing authority, the county would not buy a building in Hawthorne without an agreement from the city. *Id.* In short, the entity that purchases the building will have to pay property taxes on it, unless Hawthorne allows its own or the county's Housing Authority to purchase the building.

The remaining question is whether the owner of Kornblum will pay substantially less in taxes than would the owner of a comparable non-Century Freeway development. At the November 13 hearing, the Kornblum developer explained that the building's purchaser would pay 1% of the building's value in property taxes to the

county and that the city gets only 7% of that 1%. Thus, for every million dollars of the building's value, Hawthorne receives only $700 in property taxes. Exhibit 20 at pp. 7–8. So, whether the building is valued at one or two million dollars more or less will make no substantial difference in the amount of property taxes the city will receive.

This court agrees with the City Manager that the building will probably sell for less than a comparable non-Century Freeway development. Exhibit 16 at p. 4. The building's value is generally determined by the income produced. The percentage of the units set aside for low income tenants will lower the income produced and therefore lower the value. But, as noted above, even if the building sold for 5 million instead of 7 million dollars, it would make little practical difference to the city's coffers. Moreover, the developer agreed to record a 10 year covenant that would require the building's owner to pay any difference in property taxes between those based on the valuation of the building that the County Assessor would make (which would be lower than a non-Century Freeway building to reflect the lower income) and the valuation the Hawthorne Building Department would make (which would be the same as a comparable non-Century Freeway building). Exhibit 20 at p. 8. Therefore, the loss of taxes to the city, if any, on the Kornblum Development will be far too minimal to justify denying the developer's applications.

(6) *Alternate Sites.* After this lawsuit was commenced, Hawthorne submitted to Goldrich & Kest a compilation of 52 alternate parcels of property upon which Century Freeway replenishment housing allegedly could be built. *See* Exhibit 202, exhibits B & C. Hawthorne argues that the developer's ability to build replenishment housing on one or more of these 52 alternate parcels eliminates any adverse effect on low-income racial minorities caused by the city's refusal to permit construction of the Kornblum Development on its proposed site, 13000 and 13001 Kornblum Avenue.

To disprove adverse effect, however, Hawthorne must do more than simply present a number of parcels where replenishment housing could theoretically be built. The burden is on Hawthorne to identify a parcel of land within Hawthorne which is properly zoned and suitable for replenishment housing under state standards. *Arlington Heights*, 558 F.2d at 1293. Moreover, time is of the essence. If replenishment housing is not ready in Hawthorne by the time its residents are displaced, they will have to move outside of the city. Thus, Hawthorne also bears the burden of identifying a parcel or combination of parcels on which the Kornblum Development, as presently planned, can be located without undue delay. The time required for the developer to draw up new building and construction plans to fit parcels whose size or configuration vary significantly from the Kornblum parcels and then to submit the new plans for state approval would delay construction of the replenishment housing past the date of displacement.[45] At this late date, even the time required by the Century Freeway Housing Program to approve re-siting the Kornblum Development on a different parcel of property would jeopardize the possibility of replenishment housing being available in time.[46]

The court finds that Hawthorne has failed to meet its burden of identifying a suitable alternate site for the Kornblum Development. The staff of the Century Freeway Housing Program reviewed the alternate parcels and submitted to the court reasons why none of the alternate sites are comparable to the proposed Kornblum site. Exhibit 301A. Twenty of the parcels require rezoning; 15 of the parcels have residential housing currently located on them, violating one of the Century Freeway Housing Program's requirements for development; 21 of the parcels are surrounded by industrial or commercial developments, violating the Housing Program's requirement that replenishment housing be surrounded by compatible uses; 4 of the parcels can accommodate fewer than 20 housing units, the minimum number of units the Housing Program requires; 2 of the parcels have current commercial use which the Housing Program does not have authority to displace; 6 of the parcels are outside of Hawthorne's jurisdiction and must be annexed before being considered within city limits; and 1 parcel is currently under construction. Exhibit 301A. The Century Freeway Housing Program staff could approve the development of replenishment housing on only 3 parcels—currently used as a park—which, when combined together, would accommodate a total of only 25 units of housing—71 units less than the proposed Kornblum Development. Exhibit 301A at pp. 10–11.

Goldrich & Kest also reviewed the alternate parcels and sent letters to owners of eight sites [47] that could possibly be suitable for the Kornblum Development. Exhibit 35 at p. 2. Three of the eight owners responded, all stating that their properties were not available for sale. *Id.* Haw-

---

**45.** Because replenishment housing must be ready by mid-1987 to accommodate the displacees, construction must begin by June 1986. Design development, final cost negotiations, civil rights processing, and contract closing must all begin by October 1985, to be completed by June 1986. To meet these dates, the developer should have submitted to the Century Freeway Housing Program by June 1985, a revised proposal on an alternate location with proof that he had site control and had obtained all necessary city approvals. This would enable the Century Freeway Housing Program to complete its site appraisal, environmental review, initial design review, and assessment of marketability, and to issue a conditional commitment letter by October 1985. Before June 1985, the developer

would have had to persuade the owner to place the alternate site on the market, negotiate a satisfactory price, design a project to fit the site, undertake preliminary engineering studies to ensure that the site is appropriate for the development, etc. *See* Exhibit 301A at pp. 2–5. The court is not aware that any of these actions have yet been taken.

**46.** *See supra* note 45.

**47.** Whereas Goldrich & Kest considered eight of the alternate sites as possibly suitable for the Kornblum Development, Hawthorne concedes that only 6 of the sites would accommodate the entire 96 unit development. Exhibit 202 at p. 7.

thorne's submission of the 52 alternate parcels does not, therefore, disprove the adverse effect caused by its refusal to permit the Kornblum Development to be built at its proposed site.

In conclusion, none of Hawthorne's purported justifications are legitimate. Because the plaintiffs and intervenors have established a prima facie case and Hawthorne has failed to rebut it, the court finds that Hawthorne has violated the Fair Housing Act, 42 U.S.C. § 3604(a).

II. Hawthorne's imposition of the 35% limitation on the number of units in the Cerise Development that may be rented to low income tenants and its denial of the lot split, zone change, and site development applications for the Kornblum Development violate California Government Code § 65008.[48]

■ The California legislature has extended the protection against discrimination in housing that Congress provided in Title VIII. California Government Code § 65008 outlaws discrimination against *residential developments* in addition to people and outlaws discrimination on the basis of *income* in addition to race. Section 65008 provides in pertinent part:

(b) No city, county, or city and county shall, in the enactment or administration of ordinances pursuant to this title, prohibit or discriminate against any residential development or emergency shelter because of the method of financing or the race, sex, color, religion, national origin, ancestry, or age of the intended occupants of the development or shelter.

(c) No city, county, or city and county shall, in the enactment or administration of ordinances pursuant to this title, prohibit or discriminate against a residential development or emergency shelter be-

cause the development or shelter is intended for occupancy by persons and families of low and moderate income....

(d) No city, county, or city and county may impose different requirements on a residential development or emergency shelter which is subsidized, financed, insured, or otherwise assisted by the federal or state governments or by a local public entity ... than those imposed on nonassisted developments....

Cal.Gov.Code § 65008 (West 1983 & Supp. 1985).

■ As a federal court exercising pendent jurisdiction over a state law claim, this court "must apply state law as the state's highest court would." *Hillery v. Rushen,* 720 F.2d 1132, 1138 n. 5 (9th Cir.1983). But the California Supreme Court has not yet decided a case involving section 65008. Indeed, the only court that has done so is a California Court of Appeal in *Bruce v. City of Alameda,* 166 Cal.App.3d 18, 212 Cal. Rptr. 304 (1985). In such a situation, this court's task is to use its " 'own best judgment in predicting how the state's highest court would decide the case.' " *Fiorito Brothers, Inc. v. Fruehauf Corp.,* 747 F.2d 1309, 1314 (9th Cir.1984) (quoting *Takahashi v. Loomis Armored Car Service,* 625 F.2d 314, 316 (9th Cir.1980) ).

(1) *Discrimination on the basis of race.* Subsection (b) of section 65008 prohibits discrimination against residential developments "because of" the race of the intended occupants.

The California Supreme Court has taken the position that a showing of discriminatory impact on a racial minority is sufficient to prove a constitutional violation. *See Crawford v. Board of Education of Los Angeles,* 17 Cal.3d 280, 289–302, 130 Cal. Rptr. 724, 551 P.2d 28 (1976); *San Francisco Unified School District v. Johnson,* 3

---

**48.** The Eleventh Amendment's grant of sovereign immunity to the States does not bar this court from determining whether Hawthorne's officials complied with California law. Where, as here, relief against a locality or its officials is not the equivalent of a monetary judgment against the State, "the Eleventh Amendment

does not apply to 'counties and similar municipal corporations.' " *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 920 n. 34, 79 L.Ed.2d 67 (1984) (quoting *Mount Healthy City School District v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977) ).

Cal.3d 937, 957–58, 92 Cal.Rptr. 309, 479 P.2d 669, *cert. denied*, 401 U.S. 1012, 91 S.Ct. 1266, 28 L.Ed.2d 549 (1971); *Jackson v. Pasadena City School District*, 59 Cal.2d 876, 881, 31 Cal.Rptr. 606, 382 P.2d 878 (1963). *See Larry P. v. Riles*, slip op. at 374, *petition for reh'g pending* (9th Cir. Jan. 23, 1984) ("To prove a violation of the state constitution equal protection clause requires only a showing of de facto segregation.").

 In enacting section 65008, the California legislature undoubtedly intended to provide greater protection against discrimination in housing than the constitutional guarantees. If a showing of discriminatory intent is unnecessary to establish a constitutional violation, it should likewise be unnecessary to establish a violation of section 65008(b). Moreover, the California legislature's use of the Title VIII "because of race" language supports interpreting section 65008(b) to require proof only of discriminatory effect. In short, this court finds that a showing of discriminatory impact is sufficient to establish a violation under subsection (b) of section 65008.[49]

 Therefore, for the same reasons this court finds that Hawthorne's actions constituted a violation of Title VIII, *see supra* pp. 1148–1156, this court finds that Hawthorne's imposition of the 35% limitation on the number of units in the Cerise Development that may be rented to low income tenants and denial of the Kornblum applications constituted a violation of California Government Code § 65008(b).

(2) *Discrimination on the basis of income.* Subsection (c) of section 65008 prohibits discrimination against a residential development "because the development ... is intended for occupancy by persons and families of low and moderate income...."

The issue before the court in *Bruce v. City of Alameda*, 166 Cal.App.3d 18, 212 Cal.Rptr. 304 (1985), was the validity of an ordinance that provided "[f]or a period of five years no more government subsidized rental housing units shall be developed in the City of Alameda, unless development of such rental units is first approved by a majority of the voters in the city of Alameda." *Id.* at 20, 212 Cal.Rptr. at 305. This ordinance facially conflicted with both subsections (c) and (d) of section 65008. The *Bruce* court held that "locally unrestricted development of low cost housing is a matter of vital state concern" and that California Government Code § 65008 preempted the city of Alameda's power to enact such an ordinance. *Id.* at 22, 212 Cal.Rptr. at 307.

 In the instant case, the city of Hawthorne's imposition of a 35% limitation of the number of units in the Cerise Development that can be rented to low income tenants also facially conflicts with subsections (c) and (d) of section 65008. *See infra* p. 1159 (discussing subsection (d)). This court believes that the California Supreme Court would reach the same conclusion as reached by the Court of Appeals in *Bruce.* Therefore, this court holds that California Government Code § 65008 preempts the City of Hawthorne's power to impose a 35% limitation on the number of units in the Cerise Development that can be rented to low income tenants.

 Hawthorne's denial of the Kornblum applications, on the other hand, does not facially conflict with California Government Code § 65008(c). To date, no court has addressed the plaintiff's burden of proof under section 65008(c) in these circumstances. This court must decide whether section 65008(c) requires the plaintiffs and the intervening developer to prove intent to discriminate on the basis of wealth, or merely that the actions have a discriminatory effect on low income persons. In light of the California Supreme Court's position that de facto discrimination on the basis of wealth is sufficient to

---

**49.** Hawthorne concedes that the burden of proof applied to Title VIII claims should be applied to section 65008 claims "since the two laws are, but for the protection afforded low income persons in Government Code Section 65008, substantially the same." Supplemental Brief of the City of Hawthorne and the Members of the Hawthorne City Council at p. 34.

prove a constitutional violation, *Serrano v. Priest,* 5 Cal.3d 584, 590, 96 Cal.Rptr. 601, 487 P.2d 1241 (1971), *appeal after remand,* 18 Cal.3d 728, 135 Cal.Rptr. 345, 557 P.2d 929 (1976), *cert. denied,* 432 U.S. 907, 97 S.Ct. 2951, 53 L.Ed.2d 1079 (1977), this court holds that proof of discriminatory effect is sufficient to establish a violation of California Government Code § 65008(c).[50]

■ Hawthorne's denial of the Kornblum applications for rezoning, lot split, and site development has an unmistakably adverse impact on low income persons. There is a dearth of decent housing in Hawthorne that is affordable to low income residents. Exhibit 2 at pp. 17, 19. The construction of the Freeway will eliminate a large number of affordable units. Over one thousand households will be displaced and at least 35% of those are low income households. At most, only 128 units of replenishment housing are under construction in Hawthorne and only 55% of those units would be affordable to low income displacees. Unless sufficient additional low income housing is built in Hawthorne by the time its residents are displaced, the low income displacees will have to move outside of Hawthorne to find affordable housing. In short, Hawthorne's frustration of the Kornblum Development has a greater adverse effect on low income than on middle and high income Hawthorne displacees because the low income displacees have the least amount of affordable housing available to them. And, as discussed *supra* pp. 1152–1156, this court finds that all of Hawthorne's purported justifications are pretexts for discriminating against the low income tenants that would reside in the Kornblum Development. Therefore, this court finds that Hawthorne's actions in denying the Kornblum applications also violated subsection (c) of California Government Code § 65008.

(3) *Discrimination on the basis of government assistance.* Subsection (d) of section 65008 prohibits a city from imposing different requirements on a state-as-sisted residential development from those imposed on a nonassisted development.

■ Hawthorne has required no developer except the Cerise developer to record a covenant providing that no more than 35% of the units can be rented to low income tenants. Indeed, it is clear that Hawthorne imposed this requirement because the Cerise Development is a Century Freeway-related development. In suggesting a limitation on the number of low income tenants, the Planning Department stated that "the project is unique to the city as it is funded by a State agency." Exhibit 6 at p. 2. The Planning Department felt that the California Department of Housing and Community Development would require too many of the units to be set aside for low income tenants, conflicting with Hawthorne's policy of dispersing low income housing. *Id.* at p. 3.

In light of the fact that Hawthorne has not imposed this requirement on any other development and the fact that Hawthorne imposed this requirement on the Cerise Development because it is state assisted, this court finds that Hawthorne's requirement of a covenant limiting to 35% the number of units rented to low income households is a clear violation of section 65008(d).

It could be argued that Hawthorne also imposed requirements on the Kornblum Development different from those it imposes on nonassisted developments because it required the Kornblum developer to prove that the development would not impact schools, density, or traffic. As noted above pp. 1153–1154, Hawthorne has approved a number of other developments in the same area without requiring the developers to affirmatively address these issues. Nevertheless, because this court has found that the City Council's denial of the Kornblum applications violated Title VIII and subsections (b) and (c) of California Government Code § 65008, it need not resolve the more difficult issue whether the denial also violated subsection (d).

**50.** Hawthorne concedes that proof of discriminatory intent is unnecessary. *See supra* note 49.

CONCLUSION

The Century Freeway is one of the most massive freeway construction projects in the history of the United States. Its construction in a populated area has the potential to disrupt the lives of thousands of persons. Plaintiffs filed the original lawsuit and participated in formulating the Consent Decree to ensure that the governmental agencies involved took steps to minimize the disruption and the impact of the project on the human environment. One of the central elements of the decree is the provision of replenishment housing. If a sufficient number of replenishment units are not built at the same time the freeway is constructed, the people displaced by the freeway may have to move substantial distances, losing their jobs, breaking up their families, and interrupting their children's education. It is therefore vital that the State proceed with the development of replenishment housing on schedule.

On the other hand, the cities affected by the freeway have a vital interest in controlling the development of their communities. In recognition of this interest, the Consent Decree provides that the replenishment housing shall be constructed "so as to be in conformity with applicable zoning, subdivision and building code laws." Amended Final Consent Decree, Exhibit B at pp. 29–30. The decree also directs this court, when evaluating the progress of the housing program, to consider "[t]he ability of communities to which housing has been and is anticipated to be relocated pursuant to the housing program to absorb such housing without unforeseen and excessive adverse impacts on their infrastructure, such as schools, sewers and public services." *Id.*, Exhibit B at p. 7.

In light of the important interests on either side, this court has thoroughly examined the evidence in support of the plaintiffs' allegations and the supplemental defendants' defenses. After careful consideration, this court has concluded that the City of Hawthorne's imposition of a 35% limitation on the number of units in the Cerise Development that can be rented to low income households violates Title VIII, 42 U.S.C. § 3604(a), and California Government Code § 65008(b), (c) & (d). Hawthorne's actions in denying the lot split, zone change, and site development applications for the Kornblum Development violate Title VIII, 42 U.S.C. § 3604(a), and California Government Code § 65008(b) & (c).

For the reasons stated above, IT IS HEREBY ORDERED that:

1. The supplemental defendants, the City of Hawthorne; the City Council of the City of Hawthorne; and Betty J. Ainsworth, Steve Andersen, Chuck Bookhammer, Guy J. Hocker, David M. York, as members of the City Council of the City of Hawthorne, are enjoined from imposing as a condition to their approval of the change of zone and site development applications for the proposed Century Freeway replenishment rental development located at 14330 Cerise Avenue, Hawthorne, California, the requirement that not more than 35% of the apartment units in the development be rented to low income persons.

2. The supplemental defendants are enjoined from refusing to approve the lot split, change of zone, and site development applications for the proposed Century Freeway replenishment rental development located at 13000–13001 Kornblum Avenue, Hawthorne, California.

3. The court shall retain continuing jurisdiction to implement and enforce the provisions of this Judgment.

4. This Memorandum and Order shall constitute the court's findings of fact and conclusions of law as authorized by Rule 52 of the Federal Rules of Civil Procedure.

The clerk of the court is requested to serve copies of this Memorandum and Order, by United States mail, upon the attorneys of record for the parties herein.

APPENDIX A (See note 27, page 1144.)

August 14, 1985

**ORDER RE: ADMISSIBILITY OF EXHIBITS 44, 45, 46, 53, 54, 56, and 57**

**Exhibit 44—Summary Report of Social Survey Conducted by Dr. James H. Johnson and Social Data Analysts**

 To admit this summary report into evidence, the plaintiffs must not only com-

ply with Fed.R.Evid. 1006, but also prove that the underlying survey is admissible. *See United States v. Johnson,* 594 F.2d 1253, 1255 (9th Cir.), *cert. denied,* 444 U.S. 964, 100 S.Ct. 451, 62 L.Ed.2d 376 (1979). The court finds that they have met both of these requirements.

First, the plaintiffs have established that a summary is the appropriate way to present the survey data. Rule 1006 provides:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place.

Fed.R.Evid. 1006.

The court cannot conveniently examine the 253 completed survey questionnaires and compute the percentages of the different reponses to the 23 questions. The summary and charts in the report prepared by Dr. James H. Johnson, Assistant Professor at the Department of Geography, University of California at Los Angeles, are a necessary aid to interpreting the survey results. Because the plaintiffs provided the City of Hawthorne with the underlying documents—the completed survey questionnaires—Dr. Johnson's report is admissible under Rule 1006.

■ Second, the court finds that the survey itself is admissible as an exception to the hearsay rule under Fed.R.Evid. 803(24). This "catch-all" exception provides that the following type of statement is not excluded by the hearsay rule, even though the declarant is available as a witness:

> A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Fed.R.Evid. 803(24).

The survey meets all of the conditions listed in exception 24. First, the survey results are evidence of facts material to the plaintiffs' allegations that Hawthorne's denial of the Kornblum Development applications and Hawthorne's imposition of a 35% quota on the number of low income tenants in the Cerise Development have an adverse racial and economic impact on the Century Freeway displacees.

Second, the survey is more probative on the issue of adverse impact than any other evidence which the plaintiffs could procure through reasonable efforts. The survey provides the most current information about the Hawthorne displacees. The 1980 U.S. Census data is five to six years old and the information in Caltrans's files is two to three years old.

Third, the general purposes of the rules of evidence and the interests of justice will best be served by admission of the survey into evidence. The rules of evidence "shall be construed to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined." Fed.R. Evid. 102. Admission of the survey results eliminates the unjustifiable expense and delay of hearing every Hawthorne displacee's testimony concerning the relevant facts. Moreover, admission of surveys promotes the development of the law of evidence because surveys are often the most expeditious way pertinent information may be ascertained and proceedings justly determined.

Fourth, the plaintiffs have established that the survey has equivalent circumstantial guarantees of trustworthiness. The

survey meets the requirements for trustworthiness set forth in the Federal Judicial Center's *Manual for Complex Litigation* (5th ed. 1982) at 116:

(1) The proper universe was selected. The plaintiffs attempted to obtain information on all of the households currently located in the City of Hawthorne to be displaced by the continuing construction of the Freeway. Out of a total population of approximately 368 displacee households currently residing in Hawthorne, 181 were surveyed over the telephone and an additional 72 were surveyed in door-to-door interviews. Hawthorne's argument that plaintiffs should have also obtained information on Hawthorne displacees who have already moved from their Freeway-affected residences is meritless. The court must determine whether Hawthorne's actions regarding the Cerise and Kornblum Developments have an adverse impact on *current* Hawthorne residents, not on former Hawthorne residents. Moreover, it would be highly impracticable to track down the people who have moved outside of the vicinity of Hawthorne.

(2) A representative sample was drawn. In this case, the plaintiffs attempted to obtain information on the entire universe. Therefore, the degree to which a sample represents the universe is not at issue.

(3) The mode of questioning the interviewees was correct. Dr. Johnson testified that he designed the questions to elicit the necessary information in as neutral a way as possible. Prior to conducting the survey, plaintiffs presented the questionnaire to Hawthorne, and Dr. Johnson modified the survey in response to Hawthorne's concerns. *See Piper Aircraft Corp. v. Wag-Aero, Inc.*, 741 F.2d 925, 931 (7th Cir.1984) (survey admissible where proponent altered survey format in response to objector's criticisms). A simple reading of the questionnaire shows that there are no trick or misleading questions. *See James Burrough Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 278 (7th Cir.1976) (survey admissible where questions "do not appear slanted or misleading").

Social Data Analysts, Inc., (SDA) the firm that conducted the telephone portion of the survey, "pre-tested" the questionnaire and determined that it was understandable before conducting the full survey. Dr. Johnson testifed that SDA is experienced in conducting surveys of this type and that the interviewers were graduate students in social geography, trained to elicit accurate, scientific data rather than biased responses. Dr. Johnson also testified that he personally oriented Mr. Carl Goldstein, the man who conducted the door-to-door interviews, and was satisfied that Mr. Goldstein would administer the survey instrument in a neutral, scientific manner.

The court rejects Hawthorne's contention that testimony of the president of SDA and/or the individual interviewers is necessary to establish trustworthiness. A leading treatise discussing surveys as evidence states that there is

> no need to have anyone other than the survey director testify at trial to substantiate the survey results. The survey director testifies as an expert who has devised and conducted a scientific poll or survey. There should be no need for testimony from the actual interviewers.... Any doubts as to the accuracy of recorded responses can be dissipated by verification checks which are common survey procedure.

2 J.T. McCarthy, *Trademarks and Unfair Competition* § 32:53 at 782–83 (2d ed. 1984); *see also Piper Aircraft*, 741 F.2d at 931 (agrees with McCarthy that "the testimony of a survey director alone can establish the foundation for the admission of survey results").

(4) Dr. Johnson and Social Data Analysts are experts in the field of social research. Dr. Johnson's resume, exhibit 43, details his impressive qualifications. In addition, Dr. Johnson's testimony establishes the qualifications of SDA. Dr. Stephen Cole, president of SDA, has written one of the leading textbooks in the field of social geography. SDA has conducted more than 150 surveys in the last 12 years, is a member of the National Council on Public Opin-

ion Polls, and adheres to the Code of Ethics of the American Association of Public Opinion Researchers. Finally, Dr. Johnson testified that Mr. Goldstein, who has also worked for the U.S. Census Bureau, has considerable experience in administering surveys.

(5) The data was gathered and reported accurately. Dr. Johnson testified that Dr. Cole gave the interviewers a three hour training session on administering the questionnaire so as to elicit accurate responses. As noted above, the interviewers need not testify to establish the accuracy of the surveying techniques; Dr. Johnson's testimony suffices. Because the questionnaire contained two questions on income, Johnson was able to test the responses for internal consistency and found that they were consistent. Moreover, a comparison of exhibit 56 (results of door-to-door survey only) and exhibit 57 (results of telephone survey only) demonstrates that the results of the telephone survey parallel those of the door-to-door survey and supports the conclusion that neither SDA nor Mr. Goldstein gathered or reported the answers in a biased or inaccurate way.

(6) The questionnaire and interviewing were in accordance with generally accepted standards in the field. Dr. Johnson testified that the methods he and SDA employed in conducting the survey were accepted social science techniques.

(7) The survey was conducted independently from attorneys for plaintiffs and state intervenors. Dr. Johnson testified that he knew virtually nothing about the litigation and therefore could relay little, if any, information about it, to Dr. Cole or Mr. Goldstein.

In short, plaintiffs have made a sufficient showing on each of these seven factors to support the court's finding that the survey has equivalent circumstantial guarantees of trustworthiness, warranting its admission under Rule 803(24). Because the plaintiffs informed Hawthorne about the survey sufficiently in advance of the trial to provide Hawthorne with a fair opportunity to prepare to meet it, exhibit 44 is admitted into evidence.

Exhibits 53, 54, 56, and 57, whose admissibility hinges on the admission of exhibit 44, are also admitted.

**Exhibit 45—Summaries of Caltrans's Current/Active files of Hawthorne Displacees.**

After the court issued its order of May 24, 1985, requesting additional information,[51] the plaintiffs attempted to gather the requested information from Caltrans's files on forms called "summaries." Agents from Caltrans filled out a summary form for each Hawthorne displacee household, using information currently existing in the Caltrans file and information they personally knew about the displacees, but which was not recorded in the file. Agents from the Department of Housing and Community Development (HCD) then supplemented the incomplete summaries with information gained by telephone calls or personal interviews.

■ To admit these summaries into evidence, the plaintiffs must satisfy Fed.R. Evid. 1006. They must also show that the information in the underlying files and the information added to each file's summary by memory, phone calls, or interviews after May 24, 1985, is admissible in evidence. *See United States v. Johnson,* 594 F.2d

51. On May 24, 1985, the court issued an order requesting the following information:

1. The racial composition of the Hawthorne displacees in each of the four census tracts affected by the freeway and of the residents in each of the two tracts in which the Cerise and Kornblum Developments are proposed to be built.
2. The percentage of Hawthorne displacee households in each of the four affected tracts that are low income households.

3. The percentage of the low income Hawthorne displacee households in each of the four affected tracts that are minority households.
4. The percentage of low income Hawthorne displacee households in each of the four affected tracts that would desire to be relocated in a Century Freeway housing project in Hawthorne.

1253, 1255 (9th Cir.), *cert. denied,* 444 U.S. 964, 100 S.Ct. 451, 62 L.Ed.2d 316 (1979). The court finds that the plaintiffs have met both requirements.

First, it would be inconvenient for the court to examine all of the relevant Caltrans files to glean out the pertinent information. The summaries are necessary to present clearly the relevant facts contained in each file. And although there was some dispute concerning plaintiffs' responsibility to make the underlying files available to Hawthorne at a reasonable time and place, Hawthorne now concedes that plaintiffs have satisfied that burden. Therefore, exhibit 45 meets the requirements of Rule 1006.

■ Second, the court finds that the information underlying the summaries is admissible under the public records exception to the hearsay rule. Rule 803(8)(C) provides that the following type of statement is not excluded by the hearsay rule, even though the declarant is available as a witness:

> Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

Fed.R.Evid. 803(8)(C).

Hawthorne concedes that the information contained in Caltrans's files before May 24, 1985, the date the court issued its order requesting additional information, fits within the exception. Hawthorne argues, however, that the additional information that Caltrans's right-of-way agents put in the summaries after May 24 based on their personal knowledge and the additional information that HCD agents added after May 24 based on their phone calls and interviews is inadmissible. Hawthorne contends that even though Caltrans and HCD agents normally gather such information, the additional information in this case was not obtained "from an investigation made pursuant to authority granted by law," Fed.R.Evid. 803(8)(C), because the information was gathered as a result of the court's order.

The Ninth Circuit rejected a similar interpretation of the business records exception in *United States v. Baxter,* 492 F.2d 150, 163–65 (9th Cir.), *appeal dismissed,* 414 U.S. 801, 94 S.Ct. 16, 38 L.Ed.2d 38 (1973), *cert. denied,* 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974). In *Baxter,* the government sought to introduce "customer books" that an informant prepared as part of the business of running a narcotics ring. The defendants contended that the books were inherently unreliable because the informant prepared them after he agreed to help the government. But the Ninth Circuit held that "the test is *not the motivation of the employee preparing the record, but the function served by the records in the operation itself.*" *Id.* at 165 (emphasis added). Because the ringleaders continued to depend on the notebooks after the date on which the informant agreed to cooperate with the government, the court held that the entries were still made in the regular course of business and, as such, admissible. *Id.; see also Abdel v. United States,* 670 F.2d 73, 76 & n. 7 (7th Cir.1982) (because Food and Nutrition Service depended on accuracy of investigative reports for statistical and other non-litigation purposes, reports admissible as business records); *Smith v. Universal Services, Inc.,* 454 F.2d 154, 157–58 (5th Cir.1972) (because EEOC investigative report was prepared in the regular course of business and pursuant to statutory authority, report admissible as business record).

Similarly, although Caltrans and HCD agents added information to the summaries in response to the court's request for additional information, it is the same type of information that Caltrans and HCD routinely gather in the regular course of business, pursuant to authority granted by law. Mr. James Dusini, Chief, California Department of Transportation Right of Way Relocation Assistance Program, testified that

Caltrans regularly maintains this sort of data on the displacees, is presently putting the summaries in the files, and will rely on the information in the summaries to make future housing decisions. Mr. Boris Storzch from HCD and the Century Freeway Housing Program (CFHP) testified that CFHP will also use the information contained in the summaries to implement its relocation housing programs. Because the agencies involved routinely gather this type of information in the course of performing their functions and will rely on the information gathered in response to the court's order, the court finds that exhibit 45 contains sufficient guarantees of trustworthiness to be admitted under Rule 803(8)(C).

Exhibit 46 is a series of charts summarizing the results of the numerous separate summaries on individual Hawthorne displacee households contained in Exhibit 45. Exhibit 46's admissibility thus depends on the admissibility of Exhibit 45. Therefore, Exhibit 46 is also admitted.